IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| ALI ALHAKEMI, | ) | |
| | ) | |
| Petitioner, | ) | 8:18CV467 |
| | ) | |
| v. | ) | |
| | ) | |
| SCOTT R. FRAKES, Director, | ) | MEMORANDUM AND ORDER |
| Nebraska Correctional Services, and | ) | |
| MICHELL CAPPS, Warden, | ) | |
| Nebraska State Penitentiary, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

Ali Alhakemi (Petitioner or Alhakemi) has filed a habeas corpus petition attacking his conviction and sentence for being a drug dealer and a habitual offender. Respondent has submitted an answer, the relevant state court records, and a brief. Although given an opportunity to submit a reply brief, Petitioner has failed to do so within the time allotted. I now deny the petition and dismiss it with prejudice.

### *Claims*

The 33-page typewritten petition is prolix and scattershot in nature but it is comprehendible and reflects a working knowledge of the English language. Respondents have, properly and fairly, boiled down the claims to these:

Claim One:        Petitioner was denied effective assistance of trial counsel because trial counsel failed to properly investigate and gather evidence to support his defense. Petitioner was denied effective assistance of appellate counsel because appellate counsel failed to raise this issue on direct appeal. (Filing no. 1 at CM/ECF pp. 7-10, 26-28.)

| Claim Two: | Petitioner was denied effective assistance of trial counsel because trial counsel failed to use an Arabic interpreter to communicate with him at all times and because trial counsel failed to properly advise him of the evidence against him so that he could make a proper decision regarding the State's plea offer. Petitioner was denied effective assistance of appellate counsel because appellate counsel failed to raise these issues on direct appeal. (*Id*. at CM/ECF pp. 10-11, 26-28.) |
|---|---|
| Claim Three: | Petitioner was denied due process of law and effective assistance of trial counsel because he was forced, despite his request otherwise, to have that specific trial counsel represent him. Petitioner was denied effective assistance of appellate counsel because appellate counsel failed to raise this issue on direct appeal. (*Id*. at CM/ECF pp. 13-18, 26-28.) |
| Claim Four: | Petitioner was denied due process of law when the trial court denied a continuance motion. Petitioner was denied effective assistance of appellate counsel because appellate counsel failed to raise this issue on direct appeal. (*Id*. at CM/ECF pp. 18-19, 26-28.) |
| Claim Five: | Petitioner was denied effective assistance of trial counsel because trial counsel affirmatively misadvised him, without an interpreter present, to proceed to trial and to decline the State's plea offer. Petitioner was denied effective assistance of appellate counsel because appellate counsel failed to raise this issue on direct appeal. (*Id*. at CM/ECF pp. 11-13, 19-28.) |

### *The Question of An Interpreter in this Court*

Perhaps to buttress his substantive claims, Alhakemi sought the services of an interpreter to prosecute this habeas action. He stated: "The Petitioner does not speak

the english language, the legal aid here at the Nebraska State Penitentiary will no longer be available to prepare and assist the [Petitioner] in any further legal work." (Filing no. 3.)

I requested a response, and Respondents submitted an affidavit from the law librarian that none of the inmate legal aids spoke Arabic and thus any previous assistance received by Petitioner from the legal aids would have had to have been provided to the Petitioner in English. (Filing no. 14-3.) Furthermore, and as I shall next point out, Petitioner was able to consummate numerous drug transactions in English, over the phone and in person, and also during his interview with law enforcement after he was arrested he was able to converse using the English language and with no seeming difficulty. (Filing no. 14-2 at CM/ECF pp. 46-47, 116-123.) Still further, the record reveals that Petitioner conversed with the state trial judge in English and without the assistance of an interpreter[1] during the state court proceedings. (Filing no. 14-1 at CM/ECF pp. 8, 12-14; filing no. 14-2 at CM/ECF pp. 9-10, 166.) Finally, as the Court of Appeals noted, at the time of trial, Petitioner had been "in the United States for 21 years." (Filing no. 18-1 at CM/ECF p. 7.[2])

### Background

#### The Trial

Alhakemi was charged with 4 counts of delivery of a controlled substance and 1 count of possession of a controlled substance. The information alleged that Alhakemi delivered methamphetamine on or about 4 separate dates in 2013, May 15, May 28, June 13, and July 5, and that he possessed methamphetamine on or about August 8. It also alleged that Alhakemi is a habitual criminal.

---

[1] An interpreter was present for the trial.

[2] The opinion on direct appeal may be found on Westlaw: *State v. Alhakemi*, No. A-14-723, 2015 WL 5698039 (Neb. Ct. App. Sept. 29, 2015).

At trial, the jury heard testimony from Jordan Wilmes, an investigator with the Lincoln–Lancaster County narcotics task force. On May 14, 2013, Wilmes met with a confidential informant (CI) who provided Wilmes the name and telephone number of a person the CI described as a source of methamphetamine in Lincoln. Wilmes researched the telephone number in a police database and confirmed the name associated with the telephone number was Alhakemi's. The CI also informed Wilmes that the methamphetamine source lived in the area of 12th Street and B Street in Lincoln, and Wilmes' research confirmed an address in that area for Alhakemi.

At Wilmes' request, the CI placed a recorded call to the telephone number he provided to Wilmes. A copy of the recorded call was received into evidence at trial, and Wilmes confirmed that the voices that could be heard on the recording belonged to the CI and a man he came to know as Alhakemi. Wilmes testified that he recognized, based on his training and experience, that the conversation between the CI and Alhakemi was consistent with the arrangement of a narcotics transaction.

The following day, the CI placed another recorded call to Alhakemi, and they arranged to meet. When the CI and Wilmes, who was working undercover, arrived at the agreed-upon location, Alhakemi got into the backseat of Wilmes' undercover vehicle. Alhakemi directed Wilmes to drive to a different location, at which Alhakemi exited the vehicle. About 15 minutes later, Alhakemi returned to Wilmes' vehicle and placed a plastic baggie containing a crystalline substance on the center console. The parties discussed a price, and Alhakemi was given $260 of drug task force buy money. Wilmes explained at trial that the drug task force provides him "buy money" for his undercover drug transactions, and the serial numbers of the buy money are recorded so that the money can later be identified during drug investigations.

Subsequent testing confirmed that the baggie that Alhakemi sold to Wilmes contained methamphetamine. Three other narcotics task force officers who were providing surveillance of the transaction testified that they observed Alhakemi exit and reenter Wilmes' vehicle.

On May 28, 2013, Wilmes made a recorded call to Alhakemi, and they agreed to meet so Wilmes could buy what Wilmes referred to in the call as "tickets," which Wilmes explained at trial meant methamphetamine. At the agreed-upon location, Alhakemi got into Wilmes' vehicle and gave Wilmes a clear plastic baggie containing a crystalline substance later determined to be methamphetamine. In exchange, Wilmes gave Alhakemi $280. Two other drug task force officers testified at trial that they observed Alhakemi enter and exit Wilmes' vehicle on that date.

Wilmes next spoke with Alhakemi on June 13, 2013, and they agreed to meet again so that Wilmes could purchase methamphetamine. At the agreed-upon location, Alhakemi got into Wilmes' vehicle, and after confirming that Wilmes wanted "a ball," which means one-eighth of an ounce of methamphetamine, Alhakemi gave Wilmes a clear plastic baggie containing suspected methamphetamine. Wilmes then gave Alhakemi $250. The contents of the baggie later tested positive for methamphetamine. Two other task force officers providing surveillance for the transaction testified at trial that they observed Alhakemi walking in the area at the time of the transaction.

Wilmes spoke with Alhakemi again on July 5, 2013, and they arranged to meet so that Wilmes could purchase methamphetamine. When Wilmes arrived, Alhakemi motioned for him to get into Alhakemi's vehicle, and Wilmes did so. Alhakemi again provided Wilmes a small, clear baggie containing methamphetamine, and Wilmes paid him $250.

Wilmes met with Alhakemi for the final time on August 8, 2013. They arranged to meet via text messages and a phone conversation so that Wilmes could purchase one-eighth of an ounce of methamphetamine. At the agreed-upon location, Alhakemi got into Wilmes' vehicle, they discussed methamphetamine, and Alhakemi provided a baggie of methamphetamine to Wilmes in exchange for $260.

Alhakemi was arrested later that day, and although Wilmes did not participate in the arrest, he was able to observe it. The task force officer who assisted in arresting Alhakemi testified that at the time of the arrest, Alhakemi had an additional quantity of methamphetamine in his pocket

as well as $257 in cash that matched the documented drug task force buy money that Wilmes had given him earlier that day. Alhakemi was interviewed after he was arrested and admitted that he had been selling methamphetamine for several months. He also described providing methamphetamine regularly to a white male with long hair named "Jay." The description matched the appearance and name Wilmes used when working undercover.

Wilmes identified Alhakemi in court as the man who had sold him methamphetamine on 5 occasions. Wilmes also confirmed that all of the events he described occurred in Lancaster County.

Alhakemi testified on his own behalf at trial. He admitted that he began using methamphetamine in 2005 and was using it almost daily at the time of the charged offenses. He admitted to meeting with Wilmes but claimed that Wilmes and the CI only gave him a ride. He denied providing methamphetamine to Wilmes or accepting any money from him. He also denied that it was his voice on the recorded phone calls.

The jury found Alhakemi guilty on all 5 counts. A habitual criminal enhancement hearing was held prior to sentencing. Upon receipt of the State's evidence, the district court found that Alhakemi is a habitual criminal, and thus, his sentences for all 5 counts should be enhanced pursuant to Nebraska statute. Alhakemi was sentenced to 10 to 12 years' imprisonment for each count with all sentences to be served consecutively. He received credit for 174 days served. He now appeals to this court.

(Filing no. 18 at CM/ECF pp. 1-3.)

### *The Direct Appeal*

Alhakemi appealed his convictions and sentences to the Nebraska Court of Appeals. He was represented by different counsel on direct appeal than at trial. (See Filing no. 18-5 at CM/ECF p. 22.) Alhakemi raised on direct appeal that the district court erred in (1) finding sufficient evidence to support his convictions, (2) ordering that the sentences be served consecutively, and (3) imposing an excessive sentence.

(Filing no. 18-1 at CM/ECF p. 3; Filing no. 18-5 at CM/ECF p. 7.) He also raised two claims of ineffective assistance of trial counsel for (a) failing to use an Arabic interpreter for all attorney-client contacts and (b) not properly advising him of the evidence against him so that he could make a proper decision regarding the State's plea offer. (Filing no. 18-1 at CM/ECF p. 3; Filing no. 18-5 at CM/ECF pp. 23-24.)

The Nebraska Court of Appeals affirmed Alhakemi's convictions and sentences. However, it found the record insufficient on direct appeal to address Alhakemi's ineffective assistance of trial counsel claims because the record did not contain Alhakemi's communications with trial counsel. (Filing no. 18-1 at CM/ECF pp. 6-7.) Alhakemi petitioned the Nebraska Supreme Court for further review of the same claims he raised in the Nebraska Court of Appeals. (Filing No. 18-7.) The Nebraska Supreme denied his petition. (Filing no. 18-3.)

### The Post-Conviction Proceedings

Alhakemi filed a verified motion for post-conviction relief in state district court. (Filing no. 18-12 at CM/ECF pp. 2-25.) Alhakemi alleged in his motion the same two ineffective assistance of trial counsel claims that he raised on direct appeal. (*Id.* at CM/ECF pp. 7-8.) He also alleged additional claims of ineffective assistance of trial and appellate counsel and of trial court error. (*Id*. at CM/ECF pp. 2-25.) The state district court denied Alhakemi post-conviction relief without an evidentiary hearing. (*Id.* at CM/ECF pp. 26-36.) Alhakemi appealed the state district court judgment to the Nebraska Court of Appeals, which affirmed the judgment of the state district court. (Filing no. 18-2.) Critically, however, Alhakemi did not petition the Nebraska Supreme Court for further review. (Filing no. 18-4.)

Some additional detail is helpful about the claims of ineffective assistance of counsel, the failure to use an interpreter when conferring with Petitioner, and the rejection of the plea offer. The state trial judge who handled the post-conviction motion was not the judge who handled the trial. Judge Burns handled the trial. Judge

McManaman handled the post-conviction matter because Judge Burns had retired by then.

Among other things, Judge McManaman carefully examined the record and found that it revealed a colloquy in English between Petitioner and the trial judge immediately before trial. Four things became clear. (Filing no. 18-12 at CM/ECF pp. 31-34.)

First, Petitioner had a full and complete understanding of the plea offer–a plea to one count carrying one habitual offender enhancement in exchange for dismissal of all the other counts and all the other habitual offender enhancements.

Second, under no circumstances was Petitioner willing to take the deal because "I won't last 10 years in prison believe me."[3]

Third, Petitioner understood what he was up against in terms of evidence as he openly admitted that "I sold to the undercover."

Fourth, there was no reason to believe Petitioner needed the services of an interpreter when conversing privately with his defense counsel. Given the plea exchange between the judge and Petitioner (discussed above), the fact that Petitioner had been in United Sates for 21 years and the fact that the undercover cop testified that all the drug deals were done in English, counsel was not ineffective for electing not to incur the unnecessary expense of hiring an interpreter for private conferences.

---

[3] Petitioner also indicated he would "take five years but [n]ot habitual. Habitual, there's no good time, no treatment, no work release, no nothing for the habitual."

The Nebraska Court of Appeals came to the same conclusion.[4] As the Court of Appeals stated,

> Based on the exchanges between the district court and Alhakemi, we conclude that Alhakemi understood the terms of the plea agreement offered by the State, but he elected to reject the offer because it would require that he serve at least the mandatory minimum sentence of 10 years. Thus, the record establishes that he did not reject the plea offer based on the advice of counsel or a lack of understanding. As a result, we conclude that trial counsel was not ineffective in the manners alleged in the postconviction motion.

(Filing no. 18-2 at CM/ECF p. 11.)

## *Analysis*

I agree with Respondents that all the claims have been procedurally defaulted either because they should have been presented on direct appeal and they were not or because when presented in the post-conviction litigation Petitioner failed to present the Nebraska Supreme Court with a petition for further review and thus the claims were not presented in one complete round of review. Since Petitioner has no other avenue open to him in the state court as Nebraska precludes two bites of the apple, the claims have been procedurally defaulted on state law grounds. Moreover, there is no basis to excuse any of the defaults whether judged under the "cause" and "prejudice" standard or the "miscarriage of justice" standard.

In brief outline form, here is the law on procedural default:

---

[4] Unlike upon direct appeal, the Court of Appeals on post-conviction review agreed that the record was then sufficient to judge the ineffective assistance of counsel claims without an evidentiary hearing. This turnabout was apparently based upon Judge McManaman's careful examination and explication of the record when he denied post-conviction relief without an evidentiary hearing.

1.    28 U.S.C. § 2254 requires a Petitioner to exhaust his claims in the state courts before coming to federal court.

2.    A state prisoner must therefore present the substance of each federal constitutional claim to the state courts before seeking federal habeas corpus relief. In Nebraska, "one complete round" ordinarily means that each § 2254 claim must have been presented to the trial court, then in an appeal to the Nebraska Court of Appeals, and finally in a petition for further review to the Nebraska Supreme Court if the Court of Appeals rules against the petitioner. *See Akins v. Kenney*, 410 F.3d 451, 454-55 (8th Cir. 2005).

3.    Where "no state court remedy is available for the unexhausted claim—that is, if resort to the state courts would be futile—then the exhaustion requirement in § 2254(b) is satisfied, but the failure to exhaust 'provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default.'" *Armstrong v. Iowa*, 418 F.3d 924, 926 (8th Cir. 2005) (quoting *Gray v. Netherland*, 518 U.S. 152, 162 (1996)).

4.    To be precise, a federal habeas court may not review a state prisoner's federal claims if those claims were defaulted in state court pursuant to an independent and adequate state procedural rule "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

5.    Under Nebraska law, you generally only get one post-conviction review; that is, "[a]n appellate court will not entertain a successive motion for postconviction relief unless the motion affirmatively shows on its face that the basis relied upon for relief was not available at the time the movant filed the prior motion." *State v. Ortiz*, 670 N.W.2d 788, 792 (Neb. 2003). Additionally, "[a] motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal." *Hall v. State*, 646 N.W.2d 572, 579 (Neb. 2002). *See also State v. Thorpe*, 858 N.W.2d 880, 887 (Neb. 2015) ("A motion for postconviction relief cannot be used to secure review of

issues which were or could have been litigated on direct appeal, no matter how those issues may be phrased or rephrased."); *State v. Filholm*, 848 N.W.2d 571, 576 (Neb. 2014) ("When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. Otherwise, the issue will be procedurally barred.") (Italics added.)

Out of an abundance of caution, and despite the obvious procedural defaults, I have asked myself whether the state post-conviction judge or the judges of the Nebraska Court of Appeals that heard the post-conviction appeal were in error regarding ineffective assistance of counsel and the plea offer. After all, the case was a slam dunk for the prosecution–hand to hand transactions with an undercover cop, the plea offer was generous, and, as a result of the rejection of the plea offer, Petitioner was effectively given a life sentence due to the consecutive nature of the sentences.[5]

But recognizing the probing inquiry by the trial judge immediately before trial and Petitioner's coherent responses in English, no reasonable judge would find that counsel was ineffective regarding the plea offer. Essentially, Petitioner, who had done prison time before, decided on his own to roll the dice and he must suffer the consequences. *See*, *e.g.*, *Barnes v. Hammer*, 765 F.3d 810, 814 (8th Cir. 2014) (applying *Lafler v. Cooper*, 132 S. Ct. 1376 (2012) and *Strickland v. Washington*, 466 U.S. 668 (1984); rejection of plea offer was not due to incompetent advice of counsel but rather because of a host of personal reasons, including that Petitioner, a pastor of church, did not want to do prison time; plea offer of 36 months rejected and 138 months in prison imposed).

---

[5] According to the Nebraska Department of Correctional Services' website, Petitioner was born on July 8, 1964, and he will not be eligible for parole until January 30, 2064.

Finally, a petitioner cannot appeal an adverse ruling on his petition for writ of habeas corpus under § 2254 unless he is granted a certificate of appealability. 28 U.S.C. § 2253(c)(1); 28 U.S.C. § 2253(c)(2); Fed. R. App. P. 22(b)(1). The standards for certificates (1) where the district court reaches the merits or (2) where the district court rules on procedural grounds are set forth in *Slack v. McDaniel*, 529 U.S. 473, 484-485 (2000). I have applied the appropriate standard and determined that Petitioner is not entitled to a certificate of appealability.

IT IS ORDERED that the habeas corpus petition (filing no. 1) is denied and dismissed with prejudice. No certificate of appealability has been or will be issued. Judgment will be issued by separate document.

DATED this 25th day of February, 2019.

BY THE COURT:

s/ *Richard G. Kopf*
Senior United States District Judge